IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>$1,074,900.00 IN UNITED STATES CURRENCY,<br><br>        Defendant,<br><br>TARA MISHRA,<br><br>        Claimant. | 8:12CV297<br><br>NONJURY FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter is before the court following a nonjury trial held on June 3, 2013. Pursuant to Fed. R. Civ. P. 52, the court makes the following Findings of Fact and Conclusions of Law. The government filed a forfeiture action pursuant to 28 U.S.C. § 1345, alleging that the defendant currency is proceeds from drug-related activity. Tara Mishra filed a claim for the defendant currency.

### FINDINGS OF FACT

On March 3, 2012, Trooper Ryan Hayes worked in the traffic division of the Nebraska State Patrol. While on duty that day, he noted a car speeding east on Interstate 80 at an estimated speed of 90 miles per hour. Trooper Hayes faced west at the time, so he crossed the median, performed a U-turn, headed east and clocked the vehicle at about 93 mph. He pulled the vehicle over and approached on the passenger side. The stop occurred at around 4:00 p.m. There is no audio of the stop. Trooper Hayes testified the audio battery was operational from 9:00 a.m. that day. He surmised that the battery lost its charge and was dead. However, Trooper Hayes did turn on the

hard-wired system in his car, and there is audio of subsequent conversations that took place inside the car.

The stop occurred in Lincoln County, Nebraska. Trooper Hayes made contact with the driver, Mr. Rajesh Manju Dheri, and the passenger, his wife, Mrs. Marina Dheri. The Dheris drove a Hertz rental vehicle with a California license plate. Trooper Hayes asked Mr. Dheri to return to the police cruiser with him. He gave Mr. Dheri a citation for speeding.

Trooper Hayes then asked Mr. Dheri a series of questions about his travel plans. Mr. Dheri indicated he and his wife flew from New Jersey where they live to Los Angeles, California, to have dinner with friends. They obtained a rental car and then started driving home, making stops in Las Vegas and Colorado to visit his wife's family and intended to continue to Omaha and Chicago to visit family. Trooper Hayes found the short period of time spent in Los Angeles suspicious, along with the fact that the rental cost for the vehicle for a week was over $2,000. Trooper Hayes returned to the subject vehicle and asked Mrs. Dheri the same questions. She answered consistently with Mr. Dheri. Trooper Hayes then returned to the cruiser and gave Mr. Dheri the ticket.

Trooper Hayes indicated he then asked Mr. Dheri if there were any illegal substances in his car, and he asked if he had drugs, guns, or large amounts of money in the vehicle. Mr. Dheri stated he did not. Trooper Hayes again asked about the itinerary and received the same answers. He told Mr. Dheri he was free to leave but asked if he could search the car. Mr. Dheri agreed to the search. Mrs. Dheri also gave her permission to search. Trooper Hayes then brought Mrs. Dheri back to the patrol vehicle. At this point, approximately 15 to 20 minutes had elapsed. The trooper opened

2

the back hatch of the vehicle and found two duffel bags and one back-pack.  See Exs. 29, 31, 35 and 36.  After a short search of the rear compartment, he opened the bags and found over $1 million in cash.  He also saw dryer sheets, rubber bands, hair tie scrunchies, and clear baggies in the duffel bags and back-pack.  Upon finding the money, Trooper Hayes returned to the cruiser and handcuffed both of the Dheris.  He told them they were not under arrest.  Trooper Hayes believed the money was related to narcotics.

On cross-examination, Trooper Hayes admitted he did not record the traffic stop.  He also admitted that the Dheris originally told him that the money was not theirs, that they were transporting it for friends (claimant Tara Mishra and her spouse Rajat Mishra) from California to New Jersey for a business deal.  The business deal involved a nightclub in New Jersey. The audio/video taken inside the cruiser supports the story given by the Dheris that they initially told Trooper Hayes that they were carrying money for the Mishras for a business deal from California to New Jersey.  Later, the Dheris stated to Trooper Hayes that the money was theirs but it was borrowed.

Trooper Hayes called in back-ups at this point.  The Dheris remained handcuffed in the police cruiser for quite some time.  They were then taken to headquarters where they again remained in the cruiser until such time as Mrs. Dheri called an officer over to tell them that Mr. Dheri had a bad shoulder and was in pain.  The audio ends at this point and the Dheris are taken into the building.  The trooper testified that he could smell a chemical odor on the money and it burned his eyes.

At some time later, the Dheris signed a "Voluntary Disclaimer of Interest and Ownership", Ex.1, and an "Advisement Concerning Potential Forfeiture Action", Ex. 2.  The Dheris signed the Advisement stating the currency belonged to them both, Ex. 2,

3

and that they were forfeiting all right to the same. There is no time stamp on either exhibit. There is also evidence that one of the officers called Mr. Mishra to verify the story told by the Dheris.

During the investigation the police fingerprinted the baggies. Mr. Mishra's fingerprints were on the baggies, although the claimant Mrs. Mishra's fingerprints were not.

Lieutenant Mark Stokey, a senior field lieutenant for traffic services, testified that he was called in as the supervisor. He arrived when the money was at the station and was being photographed by the officers. He contacted K-9 Officer Jeramiah Johnson who brought his K-9 trained dog, Debo, to the station. The K-9 is trained for sniffing methamphetamine, marijuana, heroin, and cocaine. Lieutenant Stokey opened doors to three offices. K-9 Debo cleared all three offices and did not alert. Lieutenant Stokey then took some money from the two duffle bags and some money they found on Mr. Dheri's person. Lieutenant Stokey placed the money from bag one in office one, from bag two in office two, and from Mr. Dheri in office three. They waited approximately 30 or 40 minutes and then took K-9 Debo through each office. On each sniff the K-9 alerted correctly, although Officer Johnson did not personally check the locations to make sure the money was in the hiding places. Trooper Johnson testified that he believed Lieutenant Stokey as to where the money was hidden. Following the dog sniff, the money was bundled, counted and placed in a night deposit bag and locked. Thereafter, the money was taken to a bank where two bank presidents met the troopers at 9:00 p.m. and put the money in the safe. The next Monday the currency was reduced to a cashier's check. Trooper Hayes testified that such procedure is the policy

4

of the State Patrol, and anything over $300 must be converted to a cashier's check and transferred to the accounting department the next business day.

The claimant's husband, Rajat Mishra, took the stand. He lives in Rancho Cucamonga, California, and has been good friends of the Dheris for approximately six years. According to Mr. Mishra, he and his wife traveled to New Jersey on February 16, 2012, and spent five days there with the Dheris negotiating the purchase of a nightclub. They met with the owner, made an offer, and the offer was rejected. Ultimately, they ended up agreeing to buy part of a bar known as 46 Lounge and put it in a Blockbuster Video space, creating the possibility of two business opportunities. They would then become a 50% owner in the business deal. Mr. Mishra testified that they set up an LLC, made plans for the renovations for the space, and were working on profit and loss and cost statements.

He testified that Mrs. Mishra worked for years as an exotic dancer and saved her money in safe deposit boxes in two different banks to purchase a business so she could leave the stripper business. At this time of trial his wife was seven months pregnant. The Dheris flew to Los Angeles and picked up the money at the home of the Mishras. The money, according to Mr. Mishra, was not a loan or a gift. Mr. Mishra also testified that the income made by his wife was reported on their tax returns. He was the joint owner on two of the safe deposit boxes, and Mrs. Mishra was the sole owner of the third safe deposit box. He testified that Ms. Mishra retrieved the money from the safety deposit boxes on two different days and transported the money to their home. She then bundled it in $10,000 bundles with rubber bands and hair ties and placed it in plastic bags. He testified that the money had a smoke-type odor, and they put dryer sheets in with the money to reduce the smell.

The Mishras own a business, New Life Fitness, which encompasses fitness and nutrition. That income does not go into the safe deposit boxes, but instead is deposited in a business account. He further testified that Mrs. Mishra does not like banks.

The last witness to testify was Tara Mishra, the claimant in this case. Mrs. Mishra testified that she first began dancing as a nightclub dancer at the age of 18. She is now 33 and she and her husband are expecting their first child. As a result of her pregnancy, she is no longer a dancer. As a nude dancer, her customers always paid her directly in cash. She saved much of her money and placed it in safe deposit boxes. She testified she does not like banks. She also testified that she claimed all of the dancing income on her tax returns. She intended to use the money she saved for a 50/50 investment with sellers and purchasers in New Jersey, including their friends the Dheris. On two different days she went to Wells Fargo Bank and then to Bank of America to get her money out of the safe deposit boxes. She counted the money. Much of the money was in rubber bands and hair ties. She put the money into baggies. She said the money smelled like an ash tray, so she put drier sheets in the baggies. When the Dheris arrived, she gave them her money. The Dheris then put the money in their bags. There was no written documentation of this arrangement with the cash. However, the claimants aver they presented the government with written documentation evidencing the proposed business transaction in New Jersey. When asked why she did not drive her own money to New Jersey, Mrs. Mishra testified that she did not want to drive across the country alone and risk getting robbed.

Mrs. Mishra testified that she had been convicted of a felony for transporting controlled substances in 2003. She served 18 months in the state prison.

6

## CONCLUSIONS OF LAW[1]

### A.  The Law

Certain currency is forfeitable to the United States pursuant to Title 21, United States Code, § 881(a)(6): "All monies . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all monies . . . used or intended to be used to facilitate any violation of [controlled substances used in violation of Title 21]."  Since the enactment of the Civil Asset Forfeiture Reform Act of 2000, the burden is on the government to establish, by a preponderance of the evidence, that seized property is subject to forfeiture.  18 U.S.C. § 983(c)(1).  "Forfeiture is warranted under 21 U.S.C. § 881 when the government establishes a 'substantial connection' between the property and a controlled substance offense.  18 U.S.C. § 983(c)(3)."  *United States v. $124,700 in U.S. Currency,* 458 F.3d 822, 825 (8th Cir. 2006) (internal quotation marks omitted).  Possession of a large amount of cash is strong evidence that the cash is connected with drug activity.  *$124,700*, 458 F.3d at 826.

"In a forfeiture action under 21 U.S.C § 881, the United States bears the initial burden of establishing by a preponderance of the evidence that the property is substantially connected to drug trafficking.  18 U.S.C. § 983(c)(1) and § 983(c)(3).  Circumstantial evidence can be used by the United States to establish its burden of proof."  *United States v. $84,615.00 in U.S. Currency,* 379 F.3d 496, 501 (8th Cir. 2004)

---

[1] The court is concerned about the lack of evidence from both sides in this case.  Mrs. Mishra offered to give a deposition.  It was scheduled but the government did not take it.  It does not appear that anyone tried to depose the Dheris.  No statistics on drug sniffs were presented to the court.  The money was not retained by the State Police for further testing even though the troopers testified that the money had an unidentified chemical odor associated with it.  The fact that there is a "chemical" odor means little to the court without some expert testing or testimony.

(citation omitted). "[T]he government does not have to show evidence of, or trace the money to, a particular transaction." *United States v. U.S. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1205 (8th Cir. 1992) (citations omitted). "Carrying a large sum of cash wrapped in rubber bands while traveling on the highway is strong evidence of a connection to drug activity." *United States v. $46,000 in U.S. Currency*, 2007 WL 1342542,*6 (D. Neb. 2007) (quoting *$124,700,* 458 F.3d at 826, and *$84,615.00,* 379 at 501-502).

If the government meets its burden, in order to avoid forfeiture the claimant has the burden of proving by a preponderance of the evidence that she is an innocent owner. 18 U.S.C. § 983(d)(1). An "innocent owner" is defined as "an owner who (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2)(A). As used in the civil forfeiture statute, an owner is defined as

> (A) A person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest; and
>
> (B) Does not include—
> . . . .
> (iii) a nominee who exercises no dominion or control over the property.

18 U.S.C. § 983(d)(6).

The statute defines the term "owner" to include "a person with an ownership interest in the specific property sought to be forfeited," and to exclude "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(A) and (B); *United States v. One Lincoln Navigator*, 328 F.3d 1011, 1014 (8th Cir. 2003) (emphasis in original).

8

### B. Analysis

*1. Standing—Legal Right to Seize and Arrest*

The government argues that because Mrs. Mishra was not a passenger or driver of the vehicle she has no standing to object to the seizure of the currency or whether there was probable cause to arrest the Dheris. See *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004) ("Fourth Amendment rights are personal rights that may not be asserted vicariously.); *see Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978), same. An individual asserting Fourth Amendment rights "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994), *Barragan*, 379 F.3d at 530 (same). The court agrees with the government. Ms. Mishra does not have standing to object to the lawfulness of the seizure of the currency or the probable cause to arrest or detain the Dheris. Ms. Mishra was not the driver, passenger, or owner of this vehicle, and thus she has no legitimate basis for asserting standing as to these issues.

Ms. Mishra clearly and without a doubt has standing under the statute to claim her ownership interest in the money. See *United States v. One Lincoln Navigator 1998,* 328 F.3d 1011, 1013 (8th Cir. 2003)[2] (claimant need not prove the merits to show

---

[2] During trial the government relied heavily on the *Navigator* case. The court finds it distinguishable in many ways. First, the *Navigator* case involved a vehicle actually used in drug distribution. Second, that case involved a summary judgment motion, not a trial. Third, the court of Appeals actually remanded the case for trial and denied summary judgment, finding there were issues of fact as to ownership. But for the government claiming the cash in both instances, the facts and issues in the two cases are not similar.

9

standing, but only a colorable interest in the property). Standing is a threshold issue that must be determined at the beginning of the litigation. *United States v. 1998 BMI "I" Convertible*, 235 F.3d 397, 399 (8th Cir. 2000). A claimant "need not prove the underlying merits of the claim." *United States v. 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002) (citation omitted). Instead, "a claimant need only show a colorable interest in the property, redressable, at least in part, by a return of the property." *Id*. A "colorable ownership interest 'may be evidenced in a number of ways including showings of actual possession, control, title and financial stake.'" *Navigator*, 328 F.3d at 1013 (quoting *United States v. One 1945 Douglas C-54 (DC-4) Aircraft,* 647 F.2d 864, 866 (8th Cir. 1981)).

The court finds a bailment relationship existed between Ms. Mishra and the Dheris. "Ownership interests are defined by the law of the State in which the interest arose." *Navigator*, 328 F.3d at 1013. The issuance of the money by the Mishras to the Dheris occurred in California. The California courts have defined bailment as: "A bailment (called deposit in the Civil Code) is the deposit of personal property with another, usually for a particular purpose, under an express or implied contract." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Personal Property, § 129, p. 119.) "A deposit may be voluntary or involuntary; and for safekeeping or exchange." (Civ. Code, § 1813.) "A voluntary deposit is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party. . . ." (Civ. Code, § 1814.) "A deposit for keeping is one in which the depositary is bound to return the identical thing deposited." (Civ. Code, § 1817.) "A deposit for exchange is one in which the depositary is only bound to return a thing corresponding in

10

kind to that which is deposited." (Civ. Code, § 1818.) Money may be the subject of a bailment. See *Anderson v. Pacific Bank,* 112 Cal. 598, 601 (1896).

The first element is met, namely, delivery of personal property from Ms. Mishra to the Dheris. The purpose of the delivery was for the Mishras' particular purchase of part of a business. Both the second and third elements are likewise met, as there was an express and implied contract that the Dheris were to keep the money and possess it for this exact purpose. The fourth element is likewise met, as the Dheris were in the process of meeting the requirements set by the Mishras when the police confiscated the money. Accordingly, the court finds that in accordance with California law, a bailment existed between the Mishras and the Dheris.

Ms. Mishra has clearly alleged an ownership interest in the defendant currency. She set forth plausible facts to support her claim as owner of the money, and there is no doubt she alleges a financial stake in this currency. Under either theory, Ms. Mishra has shown a colorable claim to ownership of the money. Accordingly, the court finds Ms. Mishra has standing to raise an ownership claim as to the defendant money.

    2. *Statute of Frauds*

The statue of frauds requires that a contract in certain circumstances must be in writing, unless an exception applies. See Calif. Civil Code §1624 *et seq.*[3] The parties did not raise the statute of frauds defense in either the pretrial conference or in their trial briefing. The issue was raised, however, during trial. The court first finds that the

---

[3] As previously stated, the court finds California state law is applicable in this case. However, even if the court applied the statutes dealing with the statute of frauds in Nebraska, the result would be the same. The statute of frauds applies to interests in land, Neb. Rev. Stat. § 36-103; the sale of goods over $500 between two or more parties, Neb. Rev. Stat. U.C.C. § 2-201; and for certain contracts not to be performed within a year; certain promises regarding debits; marriage; estate damages; and repurchase of certain bonds and securities, Neb Rev. Stat. § 36-202.

parties waived their right to assert this defense, in the first instance, as no objections were raised to the documents containing hearsay. However, the court will address the issue in the event the issue is raised on appeal.

The court does not believe the statute of frauds is applicable to this case. The original parties to the transaction are not asserting claims against each other for failure to comply with an agreement, written or otherwise. Furthermore, there is no claim for breach of any part of this transaction.

Third parties who are in some way in privity with a party to a contract can take advantage of a statute of frauds defense in the same way that party would do so. *O'Banion v. Paradiso,* 61 Cal.2d 559, 393 P.2d 682, 684 (Cal. 1964). The government could argue that it is in privity with the Mishras through the Dheris. The Dheris waived all rights to the money and effectively ceded their property rights to the government. The government could then contest the validity of the arrangement since it is not in writing. This theory is unavailing since neither party to the arrangement contests the elements or subject of the bailment. The statute of frauds cannot be used as a defense in a bailment case in which both the bailor and bailee agree on the corpus or the purpose of the bailment.[4] The is no dispute between the Dheris and Mishras concerning the amount of cash or that the Mishras entrusted it to the Dheris.

In summary, the court finds (1) the parties waived the statute of frauds as a defense; and (2) the statute of frauds is inapplicable in this case or any claims the

---

[4] In any event, the court notes that a bailment can be implied and need not be in writing. "In a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men." *H.S. Crocker Co. v. McFaddin*, 148 Cal.App.2d 639, 643, 307 P.2d 429 (1957). "California law generally defines a bailment as the delivery of a thing in trust for a purpose upon an implied or express contract." *Whitcombe v. Stevedoring Services of America*, 2 F.3d 312, (9th Cir. 1993).

government might make as to the lack of a written agreement between the Dheris and the Mishras.

### 3. Hearsay

A statement offered to prove the truth of the matter asserted is hearsay unless it originates while a declarant is testifying at trial. See Fed. R. Evid. 801(c). *United States v. Lewis,* 436 F.3d 939, 944 (8th Cir. 2006). During the trial an issue emerged regarding hearsay statements in Exhibits 1-3. The court took the objections under advisement. In Exhibit 1 the Dheris disclaim ownership of the money. However, when the Dheris were first asked regarding the ownership of the money, they indicated it belonged to the Mishras. They further told Trooper Hayes they were taking the money to New Jersey on behalf of the Mishras. Later, the Dheris said they borrowed it from the Mishras. Ultimately, following their handcuffing, trip to the state police station and detention, they claimed ownership and disclaimed the money. Ex. 2. Ms. Mishra objects to these exhibits on the basis that they contain hearsay statements. However, the court finds there were no objections to these exhibits during the pretrial conference by either party. Accordingly, the court finds these objections are waived. As mentioned previously, the parties have chosen not to attempt to bring the Dheris to trial or to take their depositions. Accordingly, Exhibits 1 through 3 are received.

### 4. Coconspirators

Fed. R. Evid. 801(d)(2)(E) provides: A statement is not hearsay if a statement was made by a coconspirator of a party during the course and in furtherance of the conspiracy. The government argues that the Dheris are coconspirators and that certain statements are admissible under the hearsay exceptions. The court asks the question, "coconspirators of what?" There is no allegation against them of conspiring to do

anything. It is reasonable to presume the government filed no criminal charges against the Dheris because it did not have probable cause to indict them. Conversely, the government asserts there is probable cause for this court to believe the seized cash is part of the same unindicted conspiracy. The coconspirator claim is not supported by the evidence. Consequently, any hearsay statements by the Dheris, excluding Exhibits 1-3, objected to by the claimant are not received for the truth of the matter asserted. They are received for the limited purpose of giving context to the events that occurred on the day of the seizure.

     5*. Merits*

A previously stated, the government must show by a preponderance of evidence that there is a substantial connection to drug trafficking. The claimant, Mrs. Mishra, must show by a preponderance of evidence that she owned the money in question. The issue initially is whether there existed suspicious circumstances to indicate a substantial connection between the money and the drug trafficking. The government argues that the large amount of money, the bundling, the fact that the money was wrapped, the use of dryer sheets, hair ties and rubber bands, and the initial lie by the Dheris as to whether they had large sums of money in their car, all give rise to suspicious circumstances and substantial connection to drug trafficking.

The court finds that Mr. Dheri initially told the officers that Mr. Mishra gave them the money to take to New Jersey. The fingerprint of Mr. Mishra on the baggie supports this story. The officers called Mr. Mishra. The Mishras confirmed the story told by Mr. Dheri, presumably at the time of the seizure and again during the instant trial. Mr. and Mr. Mishra gave the government the names of the persons in New Jersey who were their partners in the business venture.

There is no evidence that these proceeds, i.e., the money, is traceable to any drug transactions. There is no direct evidence to link this money with drug transactions, other than the dog sniff, which the court finds, as set forth below, has minimal value.

This particular K-9 alerts to four different drugs. Because Mrs. Mishra was unable to do any independent testing, there is no way to know the quantity of drug(s) the K-9 alerted to in this instance. While this might not be an issue in most cases, it is certainly an issue in a case like this one, where the primary alleged connection to drugs is a dog sniff. The court also is somewhat troubled by the policy of the State Patrol regarding the disposition of cash. While the court acknowledges the legitimate purpose of not keeping money at headquarters for safety reasons and for possible theft or loss, the court is very concerned with the inability of a claimant as in this case to be able to mount a defense to the Patrol's allegations of drugs on the money. There is no way for a claimant to rebut such an accusation, when the money is destroyed.

This is very troubling, particularly when one considers that in cases involving evidence in blood or alcohol cases, the defendant generally has an opportunity to test substances with their own experts. However, the court is likewise aware that a number of courts require a showing of bad faith regarding cases involving the destruction of evidence. See *Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988); *United States v. Smith*, 534 F.3d 1211, 1224-1225 (10th Cir. 2008); *United States v. United States Currency in the Amount of $228,536.00*, 895 F.2d 908, 917 (2d Cir. 1990); *United States v. Akins*, 995 F. Supp. 797 (M.D. Tenn. 1998); *but see Arizona v. Youngblood*, 488 U.S. 51 (1988) (intentional destruction of potentially useful evidence may constitute a denial of due process of law), and *California v. Trombetta*, 467 U.S. 479, 488-89

(1984) (government may not intentionally destroy evidence that might be expected to play a significant role in suspect's defense).

The court is also troubled by the fact that the seized bills are not available for inspection. The claimant alleges that she saved this currency for many years. She testified how she secured the bills on the job and how she converted small denomination bills to larger denominations for deposit over the years. Paper money is printed and recirculated on a regular short-term basis. Had even the serial numbers of the bills been preserved, the claimant's assertion could have been verified.

Further, the government offered no statistical support for the dog sniff. For example, how often would a dog not alert to a large quantity of cash? Judge Beam has determined that nearly all money is tainted with the odor of drugs. *Muhammed v. Drug Enforcement Agency,* 92 F.3d 648, 653 (8th Cir. 1996). The court would have appreciated some objective statistical information regarding the correlation to quantity of drug-positive sniffs and amount of money seized. There was no evidence offered in this regard. For all the court knows, there is a 90% chance that all money is drug tainted. There simply is no quantification, and all the sniff evidence offered is anecdotal. As stated by the Justice Stevens in his dissenting opinion:

> Without some form of an exception for innocent owners, the potential breadth of forfeiture actions for illegal proceeds would be breathtaking indeed. It has been estimated that nearly every United States bill in circulation—some $230 billion worth—carries trace amounts of cocaine, so great is the drug trade's appetite for cash.

*Bennis v. Michigan*, 516 U.S. 442, 460 n. 1 (1996) (dissenting opinion of Justice Stevens).

Further, there is no evidence regarding what the troopers who handled the money prior to the dog sniff did that day. Had any of them already come in contact with

drugs? For all these reasons, the court finds the dog sniff is slight evidence at best in this particular case. See *United States v. $124,700 in U.S. Currency*, 458 F.3d at 826 n.1 (citing to Eighth Circuit cases finding "slight" value to a canine alert).

For all of these reasons, the court determines that the canine alert in this case has minimal evidentiary value.

The court is further concerned about the Dheris' apparent change of heart concerning ownership of the money. It is clear that the Dheris initially told Trooper Hayes that they were transporting this money for someone else. They explained the business deal to Trooper Hayes. They were handcuffed for a long period of time while "not under arrest" and then "transported to headquarters in handcuffs" where they later claimed ownership in the money, and disclaimed all their interest. They were then allowed to leave. The troopers gave them several thousand dollars, apparently found in Mr. Dheri's pants pocket at the time of the stop.[5]

The government failed to show a substantial connection between drugs and the money. In general, the government left too many unanswered questions and had a general failure of proof in this case. None of the claimant's evidence concerning ownership, the amount of the money entrusted to the Dehris, or the predicate business transaction in New Jersey was rebutted or challenged by the government. The court was advised by the parties that both parties had adequate discovery. The only reasonable conclusion that the court can make is that the evidence presented by the claimant is reliable. "Lots of money" is not a sufficient basis in and of itself generally for forfeiture. The dog sniff is inconsequential. Further, there is just an overall lack of

---

[5] The court finds this decision very odd given the fact that the K-9 also alerted to the money in Mr. Dheri's pocket, yet the State Police Troopers gave this alleged drug money back to the Dheris.

evidence to support the government's burden in this regard. There is no nexus between the currency and any illegal activity. See *$124,700,* 458 F.3d 822 (Judge Lay dissenting) (wherein Judge Lay lists cases requiring a nexus to drug activity).

For the record, the court also finds that the Mishras' story is credible and has been consistently told by the Mishras and corroborated initially by the Dheris. The court finds Ms. Mishra has proven by a preponderance of the evidence that she is the owner of the defendant currency. Pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 983(d)(1)-(6), the court finds Ms. Mishra did have control over the money and directed the Dheris to deliver the money to New Jersey for the purchase of the business.

For the foregoing reasons the claimant Tara Mishra is entitled to judgment directing the United States government to return to her $1,074,900 in United States currency or the equivalent in a check, plus legal interest measured since March 3, 2012.

Dated this 18th day of July, 2013.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge